UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        x     Master File No.
In re AOL TIME WARNER                   x     02 Civ. 6302 (SWK)
SHAREHOLDER DERIVATIVE LITIGATION       x
                                        x     **MEMORANDUM OPINION**
----------------------------------------X
**SHIRLEY WOHL KRAM, U.S.D.J.**

     This Opinion considers the fairness of a settlement (the "Settlement") reached in the shareholder derivative litigation arising from alleged accounting and compliance misconduct by directors and officers of America Online, Inc. ("AOL") and AOL Time Warner, Inc. ("AOLTW") in the years preceding and following AOL's merger with Time Warner, Inc. ("Time Warner").[1] For the following reasons, the Settlement and form of notice are approved.

**I. Background**

     The Settlement resolves several different tracks of litigation: (1) an action filed in the Southern District after the Company ignored, and eventually refused, shareholder demands to investigate allegedly improper and illegal conduct at AOLTW (the "Demand Action"); (2) actions filed, without the plaintiffs first having made a demand upon the Company, in federal court and in the Delaware Court of Chancery (the "No-Demand Actions"); (3) lawsuits filed under Title 8, Section 220 of the Delaware

---

[1] Although Defendant AOLTW has changed its name to Time Warner, Inc., for clarity, the Court will continue to refer to the merged entity as AOLTW, or the Company.

General Corporation Law, seeking production of documents relevant to the alleged misconduct (the "Section 220 Actions"); and (4) a complaint filed on behalf of the Company against AOLTW's auditor, Ernst & Young, and investment banks Morgan Stanley and Smith Barney (the "Auditor and Investment Bank Action"). Each track of litigation arises from common allegations of misconduct.

Plaintiffs allege that declining internet stock values in 1999 and 2000 led AOL personnel, with the knowledge or reckless disregard of that company's directors, to routinely override and abuse internal policies and procedures with respect to the negotiation, contracting, and accounting of revenues.[2] Those same directors comprised half of the board at the merged entity when AOLTW failed to rein in the continuing misconduct at the AOL business division. Plaintiffs argue that directors and senior officers of AOLTW "breached their fiduciary duties to the Company and its shareholders by . . . knowingly (or with conscious disregard of obvious facts) ignoring the clear and longstanding 'red flag' warnings of systemic corporate governance and compliance breakdowns and widespread instances of management override of compliance controls." (Pls.' Br. 11.) In

---

[2] The conduct underlying this action was also the basis of the recently settled securities class action against the Company. See In re AOL Time Warner, Inc. Securities & "ERISA" Litigation, No. MDL 1500, 02 Civ. 5575(SWK), 2006 WL 903236, at *1 (S.D.N.Y. Apr. 6, 2006).

addition, Plaintiffs argue that the defendants breached their fiduciary duties to the Company by failing to design sufficient internal governance controls to evaluate the effectiveness of their financial and operational compliance processes.

Since the first shareholder derivative complaint was filed, Plaintiffs have engaged in extensive investigation, reviewing millions of corporate documents obtained through discovery and in response to their Section 220 document requests. Additionally, Plaintiffs have participated in numerous depositions, consulted with experts, and prepared submissions assessing the strengths and weaknesses of their claims in the context of settlement negotiations overseen by a court-appointed special master. The parties ultimately entered into a stipulation of settlement after months of negotiations mediated by the special master.

The Settlement consists of two major components--(1) extensive governance and compliance provisions at the board and management level, and (2) an acknowledgment by the Company that the derivative actions were a "substantial factor" in the Company's ability to obtain an approximately $200 million recovery from its director and officer liability insurance carriers. (Stipulation of Settlement ¶ 7.1.) The governance and compliance provisions focus on the centralized oversight of compliance systems, the increased independence of the board of

directors and compliance personnel, the design and implementation of an expanded operational audit to complement the Company's enhanced financial audit procedures, and a funding commitment to fully implement and support all governance and compliance systems for at least four years from the effective date of the Settlement. The monetary recovery will help to offset the substantial losses alleged by the derivative actions. Further, the Settlement narrowly limits the use of those funds to ensure that the bulk of the proceeds are available for the direct benefit of the Company.

The Court held a preliminary approval hearing on April 26, 2006, before preliminarily approving the Settlement and setting the stage for the distribution of notice shortly thereafter. The Plaintiffs proceeded to publish a summary notice in the *Wall Street Journal* and *New York Times* on May 17, 2006, and sent out over a million notices to shareholders. In addition, Plaintiffs set up a website and toll-free telephone number to provide shareholders with information about the Settlement. The notice period yielded just ten responses, with only seven of those ten objecting to some aspect of the Settlement or Plaintiffs' request for attorney's fees. Only one objector appeared at the final approval hearing, and this objection solely contested Plaintiffs' application for attorney's fees.

## II. Discussion

### A. Standard for Approval of Shareholder Derivative Settlements

"Before approving the settlement of a derivative action, the Court must be satisfied that the compromise 'fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted.'" Mathes v. Roberts, 85 F.R.D. 710, 713 (S.D.N.Y. 1980) (quoting Republic Nat'l Life Ins. Co. v. Beasley, 73 F.R.D. 658, 667 (S.D.N.Y. 1977)). In applying this standard, courts commonly inquire into "whether the compromise is fair, reasonable and adequate," In re Metropolitan Life Derivative Litig., 935 F. Supp. 286, 291 (S.D.N.Y. 1996) (quoting Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982), cert. denied, 464 U.S. 818 (1983)), with respect to both "the negotiating process leading up to settlement as well as the settlement's substantive terms." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). A court should not engage in mere "rubber stamp approval" of the settlement, yet it must "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974).

"Public policy, of course, favors settlement." In re Metropolitan Life, 935 F. Supp. at 291 (citing Weinberger, 698 F.2d at 73; Williams v. First Nat'l Bank, 216 U.S. 582, 595 (1910); TBK Partners, Ltd. v. Western Union Corp., 675 F.2d 456,

461 (2d Cir. 1982)). As the Second Circuit has long recognized, "[t]here are weighty justifications, such as the reduction of litigation and related expenses, for the general public policy favoring the settlement of litigation." Weinberger, 698 F.2d at 73. "Moreover, because shareholder derivative actions are 'notoriously difficult and unpredictable, . . . settlements are favored.'" Mathes, 85 F.R.D. at 713 (quoting Schimmel v. Goldman, 57 F.R.D. 481, 487 (S.D.N.Y. 1973)). With this policy in mind, the Court addresses the procedural and substantive fairness of the Settlement.

**B. Procedural Fairness: The Negotiation Process**

"A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from 'arms-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests.'" D'Amato, 236 F.3d at 85 (quoting Weinberger, 698 F.2d at 74). Further, the Second Circuit has noted that that "a court-appointed mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure." Id. (citing County of Suffolk v. Long Island Lighting, 907 F.2d 1295, 1323 (2d Cir. 1990)).

This Settlement comes on the heels of extensive arms-length negotiations, overseen and assisted by a court-appointed special master, with all parties represented by experienced counsel. The negotiation phase followed significant discovery, which bolstered the parties' assessment of the strengths and weaknesses of their positions and informed their negotiation strategies. The negotiations between the parties spanned an extended period of time and benefited from multiple proposals passed between the parties throughout this period. Under these circumstances, counsel's "recommendation for approval of the Proposed Settlement is entitled to 'considerable weight.'" In re Metropolitan Life, 935 F. Supp. at 294 (quoting Fielding v. Allen, 99 F. Supp. 137, 144 (S.D.N.Y. 1951)).

## C. Substantive Fairness: The Settlement Terms

In evaluating the fairness, reasonableness, and adequacy of a settlement, the court is primarily concerned with "the strength of the case for plaintiffs on the merits balanced against the amount offered in settlement." Grinnell, 495 F.2d at 455, cited in Mathes, 85 F.R.D. at 714. In the context of shareholder derivative litigation, several of the factors enunciated in Grinnell inform the Court's evaluation of whether a settlement is fair, reasonable, and adequate: (1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of

success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the proposed settlement. See In re Metropolitan Life, 935 F. Supp. at 292; accord Grinnell, 495 F.2d at 463.

### 1. The Reasonableness of the Benefits Achieved

When considering the benefits achieved by a settlement, courts must keep in mind that "there is a range of reasonableness with respect to a settlement--a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972). Here, although the underlying complaints allege substantial overstatements, lost business opportunities, regulatory settlements and fines, and a staggering loss of goodwill, the benefits incorporated into the Settlement are reasonable in light of the substantial difficulties that would frustrate a potential trial recovery. For instance, the monetary damages allegedly suffered by the Company are not easily recovered at trial. See, e.g., In re Metropolitan Life, 935 F. Supp. at 293 (noting that damages such as "loss of good will and loss of future sales . . . are usually difficult to prove"). Nevertheless, the Settlement helped the Company to recognize a significant monetary recovery in the form

of the insurance proceeds. Even more importantly, the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits. The preventative aspect of these provisions is itself a significant benefit of the Settlement.

AOLTW's promise to fully fund extensive compliance and governance provisions will not only help deter the type of misconduct underlying Plaintiffs' claims, but may enhance investor confidence by ensuring that the Company maintains a healthy governance structure. Instituting direct board involvement with compliance and internal controls will set a new tone for the Company and provide for greater management accountability in the case of future misconduct. See id. at 292 (noting that "significant structural changes" to management "will surely help prevent the recurrence" of the practices that led to the regulatory action and lawsuits at issue). Several experts agree that the structural changes covered by the Settlement, including the creation of an operational audit, will confer a substantial benefit on the Company. (Lam Decl. ¶ 25; Langevoort Decl. ¶ 37; Shank Decl. ¶ 13.)

While the non-monetary benefits here are substantial enough to merit approval of the Settlement, see, e.g., Mills v. Electric Auto Lite Co., 396 U.S. 375, 395 (1970) (recognizing

that "a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature"); <u>Kaplan v. Rand</u>, 192 F.3d 60, 69 (2d Cir. 1999), the Stipulation of Settlement also indicates that the shareholder derivative actions were a "substantial factor" in the Company's receipt of $200 million in insurance proceeds. (Stipulation of Settlement ¶ 7.1.) In light of the significant limitations placed on the use of these funds, the obtainment of the insurance proceeds may be considered a further benefit of the Settlement. In sum, the benefits achieved by the Settlement are substantial.

### 2. The Likelihood of Success in Light of the Risks Posed by Continued Litigation

Without the benefit of a fully developed record, courts must heed the Supreme Court's admonition not to "decide the merits of the case or resolve unsettled legal questions." <u>Carson v. American Brands, Inc.</u>, 450 U.S. 79, 88 n.14 (1981). Rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." <u>In re Global Crossing</u>, 225 F.R.D. at 459 (citing <u>In re Austrian & German Holocaust Litig.</u>, 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000)).

Several of the complaints consolidated in this litigation were filed without making a demand on AOLTW. As such, proving

demand futility is merely the first of several hurdles Plaintiffs would face before ever reaching trial. See Aronson v. Lewis, 473 A.2d 805 (Del. 1984) (setting forth the standard for demand futility), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del. 2000). At the motion stage, Plaintiffs would also have to overcome the substantial protection the business judgment rule provides to independent committees of the board. See, e.g., Maher v. Zapata, 714 F.2d 436 (5th Cir. 1983) (approving dismissal of shareholder derivative suit on the recommendation of an independent investigation committee). Further, the defendants would likely move to dismiss the complaints for failure to adequately plead a breach of fiduciary duty.

At trial, Plaintiffs would also be challenged to prove the role of various directors and senior officers in the alleged misconduct and that they breached their fiduciary duties of care and loyalty. The inclusion of investment banks and the Company's auditor as defendants adds another level of complexity to this litigation, providing the individual defendants with the ability to argue that they reasonably relied on the expertise and responsibility of those specialized actors. See, e.g., Brehm, 746 A.2d at 261. Even assuming that Plaintiffs were able to successfully establish the defendants' liability, they then would be tasked with proving highly contested damages.

11

In short, Plaintiffs would confront considerable risk if they were to litigate this action to completion. The tangible benefits of the Settlement are put into stark relief by the considerable barriers to any potential recovery at trial.

**3. The Likely Duration and Cost of Continued Litigation**

This litigation commenced nearly four years ago with the filing of the first No-Demand Action. Since that time, Plaintiffs have commenced reviewing over 12 million documents obtained in discovery, participated in depositions, and gauged the strength of their case in preparation for settlement. These preparations are merely the preliminary stages of what in all likelihood would be an arduous and drawn-out litigation. As discussed above, this litigation boasts numerous defendants, multiple claims, and complex factual issues; the prosecution of this action would require the Company to incur substantial costs. Termination of the litigation at this stage of the proceedings "obviat[es] the expenditure of any future time and expense in connection with this action," and will allow the Company to direct its full attention to its substantive business. Mathes, 85 F.R.D. at 714.

**4. Shareholder Objections to the Proposed Settlement**

The reaction of shareholders may be gauged by reference to the extent of objection to the settlement. In the context of class actions, courts in this Circuit have noted that "the lack

of objections may well evidence the fairness of the Settlement."
In re American Bank Note Holographics, 127 F. Supp. 2d 418, 425
(S.D.N.Y. 2001); see also Wal-Mart Stores, Inc. v. Visa U.S.A.,
Inc., 396 F.3d 96, 118 (2d Cir. 2005); D'Amato, 236 F.3d at 86-
87. The same principle applies to shareholders' approval of a
derivative settlement. Here, there was minimal response by AOLTW
shareholders, and only a small portion of that correspondence
stated any objection to the substantive terms of the Settlement.

Out of approximately one million notices sent to
shareholders, only ten individuals sent letters or formally
filed objections with the Court. Only seven of these objected to
the terms of the Settlement or Plaintiffs' request for
attorney's fees. Of these, the comments of three objectors are
insufficiently detailed to allow a substantive rebuttal by the
proponents of the Settlement. These are considered solely to the
extent that they represent the three shareholders'
disappointment with the Settlement.

The remaining four objectors variously contested the scope
of the release, the nature of the benefits, the implementation
of the governance and compliance provisions, and the amount of
attorney's fees requested. While this latter issue will be taken
up in a separate opinion establishing attorney's fees, the
former three objections reflect either a misunderstanding of the
terms of the Settlement or a mere preference for a different

resolution. Such objections are insufficient to overcome the support Plaintiffs have provided in favor of the Settlement. See Mathes, 845 F.R.D. at 715 (While objectors "may have preferred a different resolution, such a preference is neither a ground for rejecting the instant proposal as unfair and inequitable nor is it evidence of the inappropriateness of the benefits to be accorded to plaintiffs and [the Company] in light of the merits of the case.") Finally, two of these individuals also objected to the time period allotted for shareholders' objections. The five weeks between the publication of notice and the deadline for objections, however, was a sufficient period to garner objections to the Settlement. See infra Part D.

In light of the low level of objection to the Settlement and the substantial benefits that it provides AOLTW, the Court finds that the Settlement is fair, reasonable, and adequate.

**D. The Notice**

Plaintiffs also move the Court for a finding that the notice is sufficient under Federal Rule of Civil Procedure 23.1. Here, Plaintiffs distributed nearly 100,000 notices on May 11, 2006 and continued to distribute notices over the course of the following weeks, eventually distributing over a million such notices. In addition, Plaintiffs published a summary notice in two nationally available newspapers on May 17, 2006. Individuals were asked to object by June 14, and the Court also provided

14

anyone in attendance at the June 28 approval hearing the opportunity to state their objections on the record. This distribution of notice was consistent with the direction of the Court and adequately satisfied due process. See Milstein v. Werner, 57 F.R.D. 515, 518 (S.D.N.Y. 1972).

**III. Conclusion**

For the foregoing reasons, Lead Plaintiff's petition for approval of the Settlement and Notice is granted. An appropriate Final Order and Judgment accompanies this Opinion. A separate opinion establishing attorney's fees and expenses will follow.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          September 6, 2006

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/6/06

15