*2/1/2010 — I have received no objections from the parties. There are a few objections filed by persons who objected to the settlement, but after reviewing them I have concluded that they do not cast doubt on the conclusion reached by the special Master. I adopt the special Master's Report as the opinion of the court and concur in his recommendation. Plaintiff's Counsel should prepare an appropriate order for entry.  Colle M^n  USDJ*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------

IN RE AOL TIME WARNER SHAREHOLDER                    02 Civ. 6302 (CM)
DERIVATIVE LITIGATION

**MEMO ENDORSED**  REPORT & RECOMMENDATION
OF THE SPECIAL MASTER

-------------------------------------

TO: **HON. COLLEEN McMAHON, U.S.D.J.:**

By order of the late Hon. Shirley Wohl Kram, I was appointed
Special Master of the Court for the purpose of reviewing and
making recommendations to the Court upon various applications for
fees and expenses filed by the law firms representing the
derivative plaintiffs in this action.   Ten separate law firms
request an aggregate fee of $9.6 million, subsuming expenses,
based on a reported "lodestar" of $5,753,064.50,[1] enhanced by a
1.60 fee multiplier.   The fee application, and the objections
filed, raise some complicated and novel issues, including the
circumstance that the settlement obtained by counsel consisted
essentially of cutting-edge changes in corporate governance.   I
respectfully recommend that the applications be granted to the
extent of awarding $8,772,335.60.

**Background of the Action**

This is the last in a trilogy of large scale matters filed in
the wake of an ill-fated merger between two corporate behemoths.[2]

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/1/10

-------------------------------------

[1] There is an arithmetical error in counsel's submission. The
firms collectively tallied fees of $5,642,089.50, but their
individual requests aggregate to $5,753,064.50. (Compendium of
Exhibits to Memorandum in Support of Derivative Plaintiffs' Motion
(["Compendium"], Ex. 12A.)
[2] The fundamental conduct underlying this action also formed the
basis of the securities and ERISA class actions against the

The underlying settlement, approved by the late Judge Kram, resolved several different tracks of litigation: (1) an action filed in the Southern District after the Company ignored, and eventually refused, shareholder demands to investigate allegedly improper and illegal conduct at AOLTW[3] (the "Demand Action"); (2) actions filed, without the plaintiffs first having made a demand upon the Company, in federal court and in the Delaware Court of Chancery (the "No-Demand Actions"); (3) lawsuits filed under Title 8, Section 220 of the Delaware General Corporation Law, seeking production of documents relevant to the alleged misconduct (the "Section 220 Actions"); and (4) a complaint filed on behalf of the Company against AOLTW's auditor, Ernst & Young, and investment banks Morgan Stanley and Smith Barney (the "Auditor and Investment Bank Action"). Each track of litigation arises from common allegations of misconduct.

As set forth in the Court's Opinion approving the settlement,[4] plaintiffs alleged that declining Internet stock values in 1999 and 2000 led AOL personnel, with the knowledge or reckless disregard of that company's directors, to routinely override and abuse internal policies and procedures with respect to the negotiation, contracting, and accounting of revenues. Those same directors comprised half of the board at the merged

Company.

[3] Although defendant AOLTW changed its name to Time Warner, Inc., for clarity and uniformity, this report will follow the Court's practice and continue to refer to the merged entity as "AOLTW," or the "Company."

[4] The background section of this report and recommendation is derived from the Court's September 6, 2006 Opinion approving the

entity when AOLTW failed to rein in the continuing misconduct at the AOL business division. Plaintiffs argued that directors and senior officers of AOLTW "breached their fiduciary duties to the Company and its shareholders by . . . knowingly (or with conscious disregard of obvious facts) ignoring the clear and longstanding 'red flag' warnings of systemic corporate governance and compliance breakdowns and widespread instances of management override of compliance controls." In addition, plaintiffs argued that the defendants breached their fiduciary duties to the Company by failing to design sufficient internal governance controls to evaluate the effectiveness of their financial and operational compliance processes. After the first shareholder derivative complaint was filed, plaintiffs engaged in extensive investigation, reviewing millions of corporate documents obtained through discovery and in response to their Section 220 document requests. Additionally, plaintiffs participated in numerous depositions, consulted with experts, and prepared submissions assessing the strengths and weaknesses of their claims in the context of settlement negotiations overseen by a court-appointed special master. The parties ultimately entered into a stipulation of settlement after months of negotiations mediated by the special master, Paul D. Wachter, in proceedings sometimes more akin to a trial than a settlement conference, with each side making its case to the special master, often with evidentiary support, and eliciting the special master's feedback and

settlement.

3

recommendations.  Counsel for each side were challenged to prove their respective positions through evidence, written presentations and oral arguments that spanned multiple days and required elaborate preparation.  In short, this was no ordinary mediation, a conclusion reinforced by examination of the attorneys' extensive time records.

The settlement consisted of two major components: (1) extensive governance and compliance provisions at the board and management level, and (2) an acknowledgment by the Company that the derivative actions were a "substantial factor" in the Company's ability to obtain an approximately $200 million recovery from its director and officer liability insurance carriers.  The governance and compliance provisions focus on the centralized oversight of compliance systems, the increased independence of the board of directors and compliance personnel, the design and implementation of an expanded operational audit to complement the Company's enhanced financial audit procedures, and a funding commitment to fully implement and support all governance and compliance systems for at least four years from the effective date of the Settlement.  The monetary recovery was designed to help offset the substantial losses alleged in the derivative actions.  Further, the settlement narrowly limited the use of those funds to ensure that the bulk of the proceeds were available for the direct benefit of the Company.

Defendants were primarily represented by the famed defense firm of Cravath Swaine & Moore.  Counsel thus faced stiff

resistance, which they no doubt anticipated and were willing to risk from the start.

The various firms seeking compensation represented several different derivative plaintiffs.  Extensive research, some of it from public media sources, was harvested for the essence of the complaints, which were eventually consolidated into a single complaint for this litigation.  Unlike the securities and ERISA cases involving AOLTW, however, the parties refrained from litigating a phalanx of dismissal motions that often arise in cases of this nature.  Instead, the parties relied upon elaborate document production and analysis, depositions and coordination with counsel litigating the securities and ERISA cases.  The actual litigation file, reviewed at the Courthouse, is unusually thin for a case of this scale, containing 57 documents, many of them relating to the settlement.  A comparable volume of other materials, however, was submitted for the mediation.

According to counsel, the main challenge faced in this particular case was tracing responsibility for the accounting irregularities into the corporate boardroom.  Liability in this case would turn largely on proving that the corporate officers and directors were responsible, through acts of omission or commission, for the roughshod accounting practices alleged.

To accomplish this goal, much of the legal work in the case consisted of the review and coding of documents – millions of pages in all, according to counsel.  The results, in turn, were used in depositions and in the settlement negotiations under the

auspices of Special Master Wachter.

While counsel faced the particular challenge of pinning responsibility for the corrupt accounting on the Company's leadership, they also had to surmount the hurdles confronting plaintiffs in the two parallel AOLTW cases. Included among these challenges was the dispute over loss causation, accentuated by the recession and the shattering of the so-called "technology bubble" which coincided with the misdeeds chronicled in the Amended Complaint. It comes as no surprise that counsel report dedicating 12,487.5 hours to the case at bar.[5]

The case was finally settled at the end of a mediation session with Special Master Wachter on February 22, 2006. Unlike the securities and ERISA settlements, or, for that matter, most settlements obtained by the plaintiffs' bar, counsel cannot point to a distinct monetary recovery attributable to their hard work. Rather, counsel point to changes in corporate governance designed to avoid future crises akin to the wrongs alleged here and to enhance corporate responsibility and profitability. Defendants and the Company not only agreed to the changes, but also to adequate funding to ensure that the reforms are properly implemented and maintained.

Counsel also extracted from defendants an "acknowledgement" that their prosecution of this derivative action was a "substantial factor" in the Company's ability to obtain an

---

[5] By way of comparison, this total is less than half of the 28,000 hours reported in the ERISA litigation and less than 10 percent of the 135,000 hours reported in the securities

approximately $200 million recovery from its director and officer liability insurance carriers. While the pressure of this additional litigation was no doubt considered by the Company and the insurance carriers, counsel in the other AOLTW litigation and the Company itself also can claim some credit for this achievement, so the Court need be mindful of rewarding multiple firms in differing cases for a single accomplishment, one in which the Company itself played a major role.

To evaluate the fee application, I reviewed a heavy volume of materials, filling three boxes, including those submitted to the mediator, and significant portions of their written product in the action. Counsel also submitted their daily time records and summaries of their expenses, broken down by firm. The documents reflect the services performed by each timekeeper, with corresponding dates and duration.

Counsel for plaintiffs, as well as the lead objector counsel, also responded to a series of requests I made after reviewing their proffers, including their retainer letters and briefs on changes in fee jurisprudence that occurred during the pendency of this analysis. They have complied with numerous requests to plug gaps in the record. In addition, I invited counsel to confer with me on February 4, 2009, an invitation accepted by several of plaintiffs' counsel but declined by the objector counsel.

At that conference, counsel stressed several matters. Foremost among them was the fact that their $9.6 million fee

litigation.

7

request was the product of mediation by Special Master Wachter involving plaintiffs' counsel, defendants and the Company. Counsel urged, accordingly, that substantial deference be given to the amount requested.

Counsel's application can claim some other unusual sacrifices. First, although they reportedly incurred $389,023.28 in out-of-pocket disbursements, they expressed willingness to absorb those expenses within the $9.6 million in fees that they seek. In addition, counsel did not adjust their hourly billing rates to correspond to more current rates, and they declined an invitation to do so.

The fees sought would be payable from the $200 million in insurance proceeds recovered by the Company. But because the insurers have already paid these benefits to the Company via an escrow, earmarked in part for the agreed corporate reforms, the fee payments should be viewed as the Company's, not the largess of an external source.

Ten firms seek compensation. Lead counsel were Morris & Morris and Greenfield & Goodman on the so-called "Demand" cases, Emerson Poynter on the "No-Demand" cases and Barrack Rodos & Bacine for the Delaware plaintiffs. Six other firms played lesser roles.

After meeting with plaintiffs' counsel, I informed the only counsel appearing for an objector, Edward F. Siegel, Esq., of the issues raised and again solicited his input. He accepted and, after several extensions, he submitted lengthy comments and

8

supporting materials to me on July 31, 2009.  Rather than address the specific points made by plaintiffs' counsel, he communicated his position by commenting on the Report & Recommendation I filed in 2007 on the ERISA counsel fee request.[6]  Among other points, he objected to the inclusion of a "lodestar" multiplier upon the fees attributable to "contract attorneys" temporarily hired by plaintiffs' law firms for purposes of this action.  Supplemental responsive briefing was then provided on this point by plaintiffs' counsel.

All counsel were also provided with an opportunity to comment upon the Second Circuit's intervening decision in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 493 F.3d 110 (2d Cir. 2007), *amended and superseded on other grounds by* 522 F.3d 182 (2d Cir. 2008).  Plaintiffs' counsel and the objector availed themselves of this invitation as well.

### Discussion

This case presents perhaps the first opportunity for a district court to apply *Arbor Hill* to an award of attorneys' fees in the context of a derivative settlement resulting in non-monetary relief.  Although *Arbor Hill's* evolutionary holding arose

---

[6] Plaintiffs' counsel have challenged Mr. Siegel's standing to object on behalf of his client, David Badzik ("Badzik").  Such disputes over standing are more appropriately within the province of the district court judge, but I have considered the objections, as they are helpful in ventilating the issues and providing a measure of "concrete adverseness which sharpens the presentation of issues." *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 115 (2d Cir. 1988).  If I were not to accept it as an objector's brief, I would nevertheless accept the submission as amicus curiae assistance under the unusual circumstances presented here.

9

in the context of a statutory fee shifting determination under the Voting Rights Act of 1965, 42 U.S.C. §1973, its principles arguably resonate at least as strongly in this case, where the guideposts are much murkier. *Arbor Hill's* market orientation echoes the Court of Appeals' pronouncement seven years earlier in its reigning common fund guidance that "market rates, where available, are the ideal proxy for [counsel's] compensation." *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2d Cir. 2000). Counsel and the objector all acknowledge some pertinence in *Arbor Hill*, although counsel would limit strict application of this recent decision to statutory fee shifting cases, the context in which it was decided. Each side nonetheless urges that its particular position is consistent with *Arbor Hill*.

*Arbor Hill* is the latest milestone in a cycle of judicial fee jurisprudence that dates back as far as the 19th century. *See Trustees v. Greenough*, 105 U.S. 527 (1881).[7] The so-called "common fund doctrine," coupled with Fed. R. Civ. P. 23(e), authorizes the Court to award fees and expenses to class counsel and certain other claimants in a duly certified class action. *See In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 222 (2d Cir. 1987), *cert. denied sub nom. Schwartz v. Dean*, 484 U.S. 926 (1987). Based on the notion that incentives and rewards are necessary for those who would take on a legal risk and

---

[7] Interestingly enough, two of the major dictates of *Goldberger*, a preference for "moderation and a jealous regard to the rights of those who are interested in the fund," can be traced back to the Supreme Court's seminal verbiage in *Greenough*. 105 U.S. at 537.

10

challenge for the benefit of a wide class, the doctrine awards the successful champions reasonable compensation from the resultant fund.

As the Court of Appeals acknowledged in *Arbor Hill*, the journey from the early days of class actions to the current day has not always been smooth, consistent or, in some cases, clear. The federal courts have shifted back-and-forth between the percentage-of-recovery method and the so-called "lodestar" method, a term now banished by the Court of Appeals to the lexical dustbin in favor of the "presumptively reasonable fee." *Compare, e.g., Winkelman v. General Motors Corp.*, 48 F. Supp. 504 (S.D.N.Y. 1942), *aff'd sub nom. Singer v. General Motors Corp.*, 136 F.2d 905 (2d Cir. 1943) *with City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974) *and with Goldberger*, 209 F.3d at 47. Despite the change in terminology, "the methodology remains the same." *Rozell v. Ross-Holst*, 576 F. Supp.2d 527, 536-37 (S.D.N.Y. 2008).

The Second Circuit has left broad discretion to the district courts in choosing between the lodestar and percentage processes. *Goldberger*, 209 F.3d at 50; *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005). Despite having this option, the district courts in the Southern District have almost uniformly embraced the percentage approach – but, notably, in cases where a monetary sum was recovered. *See, e.g., Banyai v. Mazur*, No. 00-Cv-9806,

11

2007 WL 959066 (SHS) (S.D.N.Y. Mar. 30, 2007) (8.45 percent fee award for \$40 million settlement); *In re AOL Time Warner, Inc. Securities & "ERISA" Litig.*, No. 02-Cv-5575, 2006 WL 3057232 (S.D.N.Y. Oct. 25, 2006); *Ling v. Cantley & Sedacca, L.L.P.*, No. 04-Cv-4566, 2006 WL 290477 (S.D.N.Y. Feb. 8, 2006); *In re Worldcom, Inc. ERISA Litigation*, No. 02-Cv-4816, 2005 WL 3116188 (S.D.N.Y. Nov. 22, 2005); *Hicks v. Morgan Stanley & Co.*, No. 01-Cv-10071, 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005); *In re WorldCom, Inc. Securities Litigation*, 388 F. Supp.2d 319 (S.D.N.Y. 2005); *FTR ex rel. Cel-Sci Co v. Adv. Fund II Ltd.*, No. 02-Cv-8608, 2005 WL 2234039 (S.D.N.Y. Sep. 14, 2005); *Spann v. AOL Time Warner Inc.*, No. 02-Cv-8238, 2005 WL 1330937 (S.D.N.Y. Jun. 7, 2005); *In re Elan Securities Litig.*, 385 F. Supp.2d 363 (S.D.N.Y. 2005); *In re Bristol-Myers Squibb Sec. Litigation*, 361 F. Supp.2d 229 (S.D.N.Y. 2005); *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317 (S.D.N.Y. 2005), *aff'd in part, rev'd in part on other grounds,* 443 F.3d 253 (2d Cir. 2006).

In this case, the choice between the percentage and presumptively reasonable fee methods is readily made. As a practical matter, aside from the nebulous "acknowledgement" that the derivative litigation was a "substantial factor" in a \$200 million insurance contribution, there is no discrete amount here to which a percentage could be applied. Because the value of the stipulated corporate reforms will be recognized in major part in future profits, goodwill and avoidance of repeat litigation, quantification of such benefits would be speculative at best.

Counsel, for good reason, do not even attempt to ascribe a tangible monetary value to the corporate governance reforms. This resembles more a case of "common benefit" than one of "common fund." *See Polonski v. Trump Taj Mahal*, 137 F.3d 139, 145 (3d Cir. 1998).

The present case is therefore more analogous to cases in which a class has received injunctive relief, for which valuation is impractical, if not impossible. *See City of Burlington v. Dague*, 505 U.S. 557, 565 n. 1 (1992)(noting "severe problems of administration in determining the value of injunctive relief"); *see also Shaw v. Toshiba America Information Systems*, 91 F. Supp.2d 942 (E.D. Tex. 2000).[8]  Indeed, though its application entails time, precision and no shortage of tedium, the hourly fee method is arguably a more objective measure in general. *See Grinnell*, 495 F.2d at 470-71 (only the lodestar method can "claim objectivity"); *see also Reiter v. Metropolitan Transportation Authority*, No. 01-Cv-2762, 2004 WL 2072369 at *4 (E.D.N.Y. Sept. 10, 2004), *rev'd on other grounds*, 457 F.3d 224 (2d Cir. 2006), *cert. denied*, 549 U.S. 1211 (2007)("the amount actually paid to counsel by paying clients is compelling evidence of a reasonable market rate"); *In re Bolar Pharmaceutical Co. Sec. Litig.*, 966 F.2d 731, 732 (2d Cir. 1992) (fee computed under lodestar method is "strongly presumed to be reasonable").

Accordingly, the presumptively reasonable fee method,

---

[8] While not strictly applicable to this derivative action, the Class Action Fairness Act of 2005, 28 U.S.C. §1712, requires the application of an hourly rate to such injunctive scenarios.

formerly known as "lodestar," emerges as the best practical and objective device to assess the worth of counsel's services in this case. Under this procedure, "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate. Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Goldberger*, 209 F.3d at 47 (citations omitted); *see also "Agent Orange" Product Liability Litigation*, 818 F.2d at 222 ("the court may, in its discretion, increase or decrease [the hourly fees] by examining such factors as the quality of counsel's work, the risk of the litigation and the complexity of the issues").

This Report & Recommendation takes into account the pitfalls of the oft-criticized lodestar procedure, through close scrutiny of the litigation record and the attorney time submissions. Critics have long contended that the lodestar created a temptation for lawyers to run up the number of hours for which they could be paid, created an unanticipated disincentive to early settlements and compelled district courts "to engage in a gimlet-eyed review of line-item fee audits." *Goldberger*, 209 F.3d at 48-49; see *also Court Awarded Attorney Fees*, Report of the 3d Cir. Task Force, 108 F.R.D. 237, 246-49 (Oct. 8, 1985); *Kirschoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986). To this day, the lodestar method continues

14

to spark criticism for generating avoidable hours, discouraging early settlement and burdening district judges (or, in this case, a special master) with tedious audits of time records. *Goldberger*, 209 F.3d at 48-49; Alan Hirsch & Diane Sheehey, *Awarding Attorneys Fees & Managing Fee Litigation* at 73-74 (Fed. Jud. Ctr. 2d ed. 2005).

With this in mind, I have thoroughly reviewed counsel's time records, as well as their other submissions to me and the case file, and recommend reductions for services that were duplicative, avoidable, inadequately documented, unnecessary or otherwise excessive in terms of staffing or time spent.

Superimposed on the lodestar framework is the admonition of the Court of Appeals in its series of recent cases to replicate as much as possible "market" compensation that would be paid by a sophisticated but "thrifty" client bargaining for such services. *Arbor Hill*, 522 F.3d at 185; *see also Simmons v. New York City Transit Authority*, 575 F.3d 170 (2d Cir. 2009). As the Court of Appeals begrudgingly but realistically acknowledged, the courts themselves have become factors in this marketplace. *Arbor Hill*, 522 F.3d at 184 ("the district court [unfortunately] bears the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively").

While invoking the marketplace as its conceptual guidepost, the Court of Appeals has reaffirmed the traditional factors utilized in determining the ultimate fee. In *Goldberger*, the

Court defined those elements as (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Wal-Mart*, 396 F.3d at 121 (*citing Goldberger*, 209 F.3d at 50); *see also Matter of Freeman*, 34 N.Y.2d 1, 9, 355 N.Y.S.2d 336 (1974) (adopting similar analyses under state law).

More recently, in *Arbor Hill*, the Court of Appeals revivified the criteria enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989). The so-called "*Johnson* factors" include (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717-19. In core substance, the *Goldberger* and *Johnson* criteria require similar assessments.[9]

---

[9] Of the *Johnson* elements, only factors 4, 7, 10 and 11 are not

*Goldberger* emphasizes two other important points, namely that "moderation" is the touchstone and, presaging *Arbor Hill*, that the district courts should strive to replicate market compensation.   209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation").  At the same time, the Second Circuit recognizes that, at least in cases where the fee, as here, is set retrospectively without the challenge of a traditional adversary, we "cannot know precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel."   *Id.*   Accordingly, the Court of Appeals requires that a "searching assessment" be performed by the district court in each case based upon the circumstances of that case.   *Id.*

*Arbor Hill* now adds, at least for the purpose of determining the presumptively reasonable fee, a set of further considerations.   In addition to assessing the factors set forth in *Johnson*, the court

> should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.

---

subsumed within the *Goldberger* analysis.   Item 11 – the length of the relationship between attorney and client - is largely irrelevant to this situation.

522 F.2d at 189.

## The *Johnson* Factors

### (1) The time and labor required.

Counsel report spending in the aggregate 12,487.5 hours on this litigation, including paralegal and clerical time.    This equated to fees of $5,753,064.50.   Of that amount, attorney time comprised    10,547.5    hours,    with    corresponding    fees    of $5,405,125.75.

Most of the work was dedicated to pleadings, motion practice, memoranda,   legal   research,   document   discovery   and   settlement activities.    Nearly two-thirds of the total reported time was spent on document discovery, which consumed 5,357.50 hours, and activities   relating   to   the   mediation   and   settlement,   which absorbed 2,736.50 hours.

A   case   of   this   nature   is   built   on   documents.    Here   in particular,   although   the   wrongdoing   had   been   chronicled   in parallel   litigation,   the   media   and   even   criminal   indictments, counsel faced the especial burden of tracing knowledge and conduct to the corporate boardroom.    This was, to a degree, a needle-in-the-haystack exercise.    The dedication of over 5,000 hours to this phase of the litigation is not surprising.    The harvest of this information was evidently sufficient to cause the defendants to agree to sweeping corporate reforms, including structural changes in the board and senior management, and to help generate a sizable monetary contribution by sophisticated insurance carriers.

The   mediation   process   was   unusually   sophisticated.    The

18

mediation often took on the atmosphere of a trial, with each side using documents, deposition testimony, legal research and negotiating skill to endeavor to persuade the mediator of the merits of its case.

With the possible exception of the pleadings, the remaining expenditures of time are commensurate with the nature of the case and the formidable opposition.  The 1,982.20 hours devoted to the pleadings are high.  These can be explained in part by the fact that various counsel had prepared their own complaints before the actions were consolidated, and that the consolidation then required collaboration on a new Amended Complaint, spanning 253 paragraphs over 109 pages.  Even so, because counsel had the benefit of the parallel securities and ERISA actions, some of which were filed before this case, it is difficult to countenance nearly 2,000 hours for work on pleadings. I recommend a reduction of 15 percent, or 297 hours, and a corresponding pro rata hourly fee reduction of $136,830 for this phase.[10]

In addition to this general analysis of the eight major components of counsel's work, I have reviewed on a line-by-line basis the daily time records of counsel.  As a result of this examination, I recommend an additional reduction of $332,429 attributable to these broad categories:   services that belong more appropriately in overhead, such as training and installation

_____

[10] A reduction in excess of 15 percent could be justified.  But elsewhere in this report and recommendation, I propose adjustments to certain individual time entries, some of which relate to the pleadings.  Limiting the generalized reduction to 15 percent will avoid a double count that would be unfair.

19

relating to electronic records; vague service descriptions; repetitive entries over multiple days; lack of corresponding entries between two timekeepers for an interactive service; full billing of travel time charges; excessive rounding of time charges; work on the fee application; excessive time on task; and charges more appropriately allocable to overhead. *See Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)(district court should adjust the basic time charges where the hours were inadequately documented or not reasonably expended).

Commendably, counsel have reviewed and accepted this proposed reduction of $332,429. In view of this concession, this Report & Recommendation will not detail the reductions on a line-by-line basis, but will instead summarize the components. For example, many disallowances consisted of conferences between or among lawyers where one participant's time was recorded but not another's. If this signals that one of the participants did not consider the service sufficiently meaningful or lengthy to bill, the reporting lawyer's time should be excised. If, on the other hand, the discrepancy stems from inadequate recordkeeping, the remedy of disallowing the recorded time may seem harsh. But the law on this subject is settled: a lawyer applying for a fee bears the burden of recording all corresponding entries. *See, e.g., Carrero v. New York City Housing Authority*, 750 F. Supp. 660 (S.D.N.Y. 1990); *see also Kirsch v. Fleet Street Ltd.*, 148 F.3d 149 (2d Cir. 1998)("we see no abuse of discretion in the . . . reduction for vagueness, inconsistencies, and other deficiencies

20

in the billing records"). Excusing these omissions would only serve to discourage thorough recordkeeping.

In other instances, time was disallowed for inadequately described services. This occurred most often where counsel's time records referred to a conference or telephone call without any identification of the other participants or the subject. Again, there is no evidence of fabrication. But without such information, the reviewer cannot discern whether the work was necessary, performed by a lawyer at the appropriate seniority level or consistent with the records of the other participants.

Travel time is another consideration. A lawyer's reasonable travel time for client business purposes should be recoverable, as the practice in this jurisdiction is to charge at a unitary hourly rate and a lawyer not engaged in travel for a client's business could presumably otherwise be representing another client at his or her hourly billing rate. Once again, however, as with any attorney's time, the key is "reasonableness."

Applying this standard to the present case, long distance travel should not be treated identically with local travel to Foley Square or opposing counsel's office in Manhattan. This is not to suggest that long distance travel should not be reimbursed at all. A long distance trip, however, affords opportunities to perform work for the present or other clients, especially with advances in technology such as laptop computers and cellular phones. Travel time not productively spent should be adjusted. This is particularly so here, where most of the travel hours were

charged by multiple out-of-town firms representing the same cause, including those from Delaware, Pennsylvania and Arkansas.[11]

For long-distance travel in which the time records contain no evidence of other work performed *en route*, I applied a reduction of 50 percent for billable hours, consistent with the methodology adopted by the district court and affirmed by the Court of Appeals in *Agent Orange*, 818 F.2d at 230; *see also Luciano v. Olsten Corp.*, 925 F. Supp. 956, 965 (E.D.N.Y. 1996), *aff'd*, 109 F.3d 111 (2d Cir. 1997).

Certain other time entries bear telltale signs of rounding and estimation, rather than precise recording. A noticeable illustration is a pattern of some timekeepers of recording much of their daily time in even-hour increments, rather than a random mixture of daily hours ending in .00, .25, .50 and .75. Those hours were reduced by 10 percent. *See Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942 (9th Cir. 2007); *New York Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1146-47 (2d Cir. 1983) (upholding percentage reductions and placing the burden on fee applicants to keep and produce "accurate records" of work done and time spent). This reduction is recommended due to imprecision, not evidence of fabrication.

The reductions finally include several miscellaneous items, such as services that should have been performed by more junior

---

[11] As discussed below, any notion that additional travel expense is justified by the lower billing rates of out-of-district counsel is negated by the billing rates utilized here, which are much closer to the prevailing rates in New York City than to the prevailing rates in counsel's home districts.

personnel, review of certain media reports or review of the same book or document by multiple personnel.[12]   Unlike statutory fee cases, the 97.5 hours recorded for preparation of counsel's fee application here are not compensable. *See City of Detroit v. Grinnell Corp.*, 560 F.2d 1093.   Some of the applicants recognized this principle and designated such time as "non-billable," while others sought reimbursement.

Paralegals and clerks are generally not included in the reductions.   With one exception, their overall time fell well within acceptable bounds, as was confirmed by a less intensive review of their daily entries.

The one notable exception is Dave Parkinson, who is described as the "Financial Analyst and Director of Information Technology" for Emerson & Poynter.   (Compendium, Tab 12, Ex. E at 6.)   He was responsible for "financial analysis, high-technology company analysis, and corporate information systems." *Id.*   Billed at the rate of $250 per hour, his 384.25 hours consisted essentially of assisting the lawyers and paralegals with computers, software and electronic document access.     Part of his service should be ascribed to normal firm overhead, while other components matched the particular demands of this case.   Had the firm not supplied

---

[12] In many instances, counsel billed for review of reports in newspapers, books and other popular publications.   Often, several attorneys read the same book or article.   Some of these published reports were apparent leads on potential evidence, while others were reports about this case or other matters such as the company's name change or layoffs which, while interesting, would not readily advance the cause of this litigation.   Charges for the former were allowed, where clearly justified by the description.   Fees for the latter were not.

its internal expert, an outside consultant performing many of his functions would have been a reimbursable disbursement and a charge that many paying clients would bear. At the same time, $250 per hour is excessive. I recommend that the charges for Mr. Parkinson be halved, which would compensate for the excessive rate and for the volume of services more appropriately chargeable to overhead. The resulting reduction is $48,031.25.

This amount is recommended in addition to the $332,429.00 in reductions for itemized attorney time and $136,830.00 eliminated for excess time on the pleadings. The total of the recommended disallowance is therefore $517,290.25, or $827,664.40 of the enhanced fee request.

These adjustments should not detract from counsel's fidelity to their cause, the laudable service they rendered or the efficiency with which much of the case was handled. There is no evidence of purposeful engagement in unnecessary work or a deliberate attempt to pad the hourly fees. Rather, many of these excesses are attributable to the pressures and time constraints of oversized litigation, the inevitable inefficiencies in cases this large, the interaction among large numbers of lawyers and the desire of senior lawyers to shepherd the case through to a successful conclusion.[13]

---

[13] As elaborated below in connection with the fee multiplier, the fee proposed by counsel was the product of an agreement with the Company, mediated by Special Master Wachter. This review and the resulting recommendations were not obviated in any respect by that circumstance. Judge Kram directed this review of the time records, knowing of the negotiated fee. In addition, Special Master Wachter did not engage in a review of the attorneys' daily

24

Notably, the hours devoted to this matter were substantially fewer than those committed to the securities and ERISA cases. In part, this results from counsel's efficient use of time and existing information. It also stems, however, from building on the work done by counsel in the parallel cases and the absence of dispositive motion practice which occurred in the two parallel matters. In fact, this case was stayed for a considerable period pending determination of the motions to dismiss the ERISA action. (Pretrial Order No. 1, Mar. 26, 2003.) Both matters were settled prior to the resolution of this action, auguring a willingness to resolve this matter with a minimum of litigation. Counsel's time records reflect consultations among the lawyers in the three cases and their use of material generated in the other actions, as well as public media reports and even books written about the scandal.

As in *Goldberger,* counsel may not welcome the use of the gimlet-eyed fee auditor's blue pencil. But had this been a more conventional attorney-client relationship in the contemporary legal workplace, counsel would have been subjected to similar scrutiny of their periodic billings by a client, corporate general counsel, auditor or other reviewer. *See also Goldberger,* 209 F.3d at 51 ("[t]oday, all lawyers, even those in the more traditional corporate practice, must submit to the 'nitpicking' of fee review").

---

time records. Those records were not even before him.

25

**(2) The novelty and difficulty of the questions.**

Derivative actions based on faulty corporate accounting practices are nothing new. Several of the most notorious corporate scandals over the past decade spawned similar - and successful - lawsuits. *See* Ralph C. Ferrara, Kevin T. Abikoff, Laura Leedy Gansler, *Shareholder Derivative Litigation: Besieging the Board* §16.01 at 16-1 (Law J. Press 2005). The Second Circuit has also reminded us that these large corporate cases born of financial wrongdoing inherently entail a baseline of complexity. *See In re: Nortel Networks*, 539 F.3d 129 (2d Cir. 2008) (declining to enhance fees based on complexity because "large securities litigations often involve complex issues").

Proving liability on the part of the company's officers and directors posed the greatest challenge. Because counsel do not have a "client" in the traditional sense who can recite the facts from memory and deliver the inculpatory documents in a neat package, extensive discovery is required, often from recalcitrant defendants and witnesses and the painstaking review of countless pages of unfamiliar documents. But that is a challenge faced by counsel in any derivative action. Neither this action nor the basic issues were especially novel. The magnitude of the case, and the attendant mass of documents, made the case more difficult than a routine derivative action in terms of burden and time, but not necessarily in terms of legal issues.

**(3) The level of skill required to perform the legal service properly.**

The skill levels required in this action fell on two

26

extremes.   On the one hand, this case demanded and received the attention of top practitioners in this area of the law for the formulation of strategy, evaluation, conduct of the mediation and overall supervision.   On the other hand, much of the other work such as research and document review could be, and, in most instances was, performed by less experienced personnel, including temporary lawyers hired under contract for this assignment.   In isolated instances, reductions were recommended, and accepted by counsel, for services performed by senior lawyers that were within the competence of basic personnel.

*Goldberger's* corresponding element is described as the "quality of the representation."   209 F.3d at 50.   The representation here was excellent.   The litigation and mediation papers prepared by counsel were persuasive and instrumental in forging the fair settlement approved by the Court.   The result, a groundbreaking series of corporate reforms, is testament to the skill and the tenacity of counsel.

At the same time, such superior work is to be expected from lawyers of their caliber and reputation, and is reflected in counsel's lucrative billing rates.   Counsel here also had the advantage of the work done and results achieved in the two parallel cases, which were settled prior to the compromise here.

**(4) The preclusion of employment by the attorney due to acceptance of the case.**

Counsel have not pointed to any specific employment forgone due to this case.   To the contrary, the lead firms here followed the practice, now common in these types of large actions, of

27

hiring temporary attorneys to help staff the matter during its pendency. Had counsel been retained for other matters, there was sufficient supervisory capacity among the ten firms, coupled with the use of these "contract attorneys," to accept other matters. The 12,487.5 hours billed over approximately four years would average out to 3,122 hours per year, barely denting the collective capacity of the ten firms now applying for fees.

**(5) The attorney's customary hourly rate.**

A lawyer's customary hourly rate plays the role of fulcrum in the lodestar process. The rate is the starting point for determining the presumptively reasonable fee.

Counsel use hourly rates ranging from $90 to $250 for paralegals, from $175 to $550 for associates and other non-partner level attorneys and from $300 to $850 for partners. These rates, though relatively high, fall within the range of those commanded by leading lawyers in the Southern District, particularly those practicing at large firms or with high profiles. At the same time, because the applicant firms are predominantly, if not exclusively, engaged in plaintiff-oriented class action, securities and derivative service, these rates are not necessarily those "actually paid to counsel by paying clients." *See Reiter v. Metrop. Transit Auth.*, 2004 WL 2072369 at *5.

According to a leading authority covering the period in which most of the work was done, the average hourly rates in New York state for associates ranged from $206 to $274 per hour,

28

while average partner rates ranged from $361 to $444. *See* Altman Weil, *Survey of Law Firm Economics* (Altman Weil Publications Inc. 2005) at 91. Other courts have recognized that rates ranging from $450 to $750 per hour were appropriate for partner-level practitioners in this district. *See* n. 17, *infra*. Most of the firms seeking compensation, however, including the four lead counsel, are located outside of New York.

This raises the difficult question of whether the presumptively reasonable fee should be evaluated on the basis of the rates prevailing in the forum district, or in the district in which counsel's offices are located and much of the work was performed.[14] If recent language from the Court of Appeals is taken literally, the answer is a facile yes. *See Simmons v. New York City Transit Authority*, 575 F.3d at 172. But an unintended windfall lurks in blindly applying this language.

*Simmons* and similar cases dealt with situations in which out-of-district lawyers sought their regular rates in districts where the prevailing rates were significantly lower. The court explained in *Simmons* that "[i]n order to overcome th[e] presumption [in favor of application of the forum rule], a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better

---

[14] There were few court appearances in this case. The mediation sessions were conducted primarily in California. Depositions were conducted in various locations. Most of the hours, however, were spent on document review, with the use of electronic databases, meaning that the bulk of the work was performed

net result." *Id.* This holding is consistent with the contemporary preference that fee awards mimic the market, with a hypothetical "thrifty," empowered client as the measuring proxy. Stated more simply, the Second Circuit has used this doctrine to *limit* fees. It has yet to address the thorny issue of using host district fees to *increase* the presumptively reasonable fee above the amount that counsel would customarily receive from "paying clients" back home. At least one other circuit has endorsed the home market rate in these situations. *Davis County Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. E.P.A.,* 169 F.3d 755, 759 (D.C. Cir. 1999) (announcing an exception to the forum rule to govern cases where "the home market is substantially less costly and the site of the bulk of the legal work"). And further complicating that issue is another question, namely whether the courts should recognize a "national bar" for these types of cases. *See Arbor Hill,* 522 F.3d at 192 ("[s]ometimes, legal markets may be defined by practice area").

The hourly rates sought by the four lead counsel substantially exceed the customary amounts charged in their home states, even within the top decile. In Delaware, for example, where the Morris firm practices, the average rate in the top bracket for the corresponding period was $425. The highest decile rate in Pennsylvania - the office location of Greenfield & Goodman and Barrack, Rodos & Bacine - was $415. In Arkansas, the home of the Emerson firm, that rate was a still lower $320. The

outside of New York.

top rates sought by these firms here, by comparison, are $585 for the Morris firm, $695 for Greenfield & Goodman, $625 for Barrack, Rodos & Bacine and $585 for the Emerson firm.[15]  Most of the lodestar for partner level work performed by these lead counsel was calculated at or close to these peak hourly rates.

The billing rates attributed to associate and other non-partner attorneys were also above the norm for the home communities.  The median rates in Pennsylvania and Arkansas for 2005 were reported at $185 and $150, respectively.  Altman Weil at 89, 91.  By contrast, the associate rates charged by the Emerson firm ranged from $175 to $375.  The associate rates for the other three lead counsel ranged from $260 to $340.[16]

Determining these community-based billing rates is far from exact science.  This is particularly so because the Altman Weil survey reports the data on a state-by-state basis, thereby

---

[15] The Altman Weil survey reports a $444 hourly average in the top decile for New York in 2005.  Altman Weil at 91.  However, that number, and the data for other states as well, cover the entire state.  According to another respected survey, the top rate that year for a leading upstate New York firm was $425 while the top partners at leading Manhattan firms were ranging between $600 and $830 per hour.  Large Philadelphia firms were billing partners at between $600 and $700 per hour.  A large firm in Memphis, Tennessee, the closest major city to Little Rock, reported partner billing rates between $200 and $525 per hour. See In Focus:  Billing, Natl. L. J. (Dec. 12, 2005).

[16] Six other firms seek reimbursement in this action, after acting as local counsel or representing tagalong plaintiffs.  The fees sought by those firms collectively, $191,345.75, are barely three percent of the total.  Suffice it to say, the hourly rates listed by those firms fall roughly within the range of the other firms, although Arthur Abbey, a noted plaintiffs' lawyer, leads all requesters at $850 for each of his 13.25 hours of work. Three of the firms, Abbey Spanier Rodd Abrams & Paradis, Shalov Stone & Bonner and Daniel Cobrinik, P.C. are based in New York and are therefore not implicated by the question of lower out-of-

discounting the higher rates prevalent in large urban centers.
Nevertheless, these and other available data lead to an
inexorable conclusion that, overall, the customary rates in the
Southern District are higher than those in smaller cities.  It is
also relevant, in connection with any claim that a national bar
exists for plaintiffs' derivative work, that Altman Weil reported
the ninth decile for partners nationally at $395 per hour and for
associates nationally at $260 per hour.  *Id.* at 83.  However
viewed, counsel are seeking hourly fees well above average.[17]

These findings create a tension between two precepts
emanating from the single decision in *Arbor Hill* – (1) the
preference for host district rates, and (2) the moderating
influence of a hypothetical thrifty client in the marketplace.
The common denominator, on the other hand, is discipline of the
fees, which in this case would ultimately be borne by the
Company's shareholders.

---

district rates.

[17] To be fair, courts utilizing the lodestar method have accepted
hourly rates at the higher end of the prevailing range, including
some higher than those sought now.  *See Goldberger*, 209 F.3d at
46 (hourly rate as high as $550 in 1996); *In re Indep. Energy
Holdings PLC Sec. Litig.*, 2003 WL 22244676, at *9 (S.D.N.Y. 2003)
(hourly rates from 5 years ago of $650/hour for partners, and
$300-$425/hour for associates were "not extraordinary for a top
flight New York City law firm"); *In re Telik, Inc. Sec. Litg.*,
576 F. Supp. 2d 570, 588-89 (S.D.N.Y. 2008) (hourly rates of $700
- $750 for partners and $300 - $550 for associates fall within
"the norm of the rates charged by those attorneys' common
adversaries in the defense bar").  Counsel are not seeking rates
outside the bounds of those sought from, and often accepted by,
prior courts.  *Arbor Hill*, however, if faithfully applied, would
now require the Court to simulate a hypothetical bargaining
exercise between a thrifty client and its prospective attorney,
as opposed to retrospectively fixing an hourly rate in quasi-
monopolistic fashion.

While *Arbor Hill* endorses the concept of a national bar in appropriate instances, the process of determining the presumptively reasonable fee is not ended by a conclusion, though partially accurate, that leading plaintiff derivative litigation specialists set their fees at $600 or more per hour, regardless of geography. The policy underlying *Arbor Hill* is to moderate fees through the use of actual or hypothetical price competition. While a monopolistic element inheres in the longstanding requirement that fees fall within a customary range, the Court of Appeals surely did not intend to entrench a national cartel over the robust competition of a national marketplace. And while the law firms in this case are all stellar organizations who can be proud of the fine work done here, it would be a stretch to find that a hypothetical client with bargaining power could not achieve billing rate concessions without sacrificing quality. If anything, the existence of a national bar, including firms with much lower overhead than those in Manhattan, should lead to greater fee competition with concomitantly lower hourly rates.

**(6) Whether the fee is fixed or contingent.**

The fee here is neither fixed nor contingent. Instead, it is rooted in an hourly computation.

It bears noting, however, that the outcome of this case - both in terms of the relief obtained and the basis for the fee - is far different than contemplated at its inception. Initially, there was a strong contingent element. The original pleadings primarily sought money damages. The ultimate settlement was

33

essentially non-monetary.

As a related matter, counsel's engagement letters at inception provided for a wholly contingent fee, based on a percentage of the anticipated recovery or a fee application to the court. Counsel themselves did not anticipate sending an hourly bill to the client or the Court, except perhaps for a less than intensive lodestar cross-check.

**(7) The time limitations imposed by the client or the circumstances.**

Although counsel were retained by nominal clients at the inception, this was a derivative action seeking to vindicate the rights of the corporation. The record contains no evidence of any special demands imposed by these clients.

Similarly, counsel point to no extraordinary time limitation posed by the circumstances. Deadlines were set by the Court and the Special Master, but none particularly out of the ordinary. As noted, some firms hired contract personnel to handle the flood of documents, marking up their costs to enjoy profits as they would with salaried associates.

**(8) The amount involved in the case and the results obtained.**

The Amended Complaint alleged billions of dollars in accounting irregularities. The case ended consensually, however, not with a monetary recovery but, instead, with the company's agreement to a series of corporate reforms. Counsel take partial, though amorphous credit for recovery by AOLTW of $200 million in insurance proceeds. The settlement agreement with defendants described the derivative action as a "substantial

34

factor" in this insurance recovery.

Given the many other pressures facing the insurers, the pendency of the two parallel cases in which other attorneys were handsomely compensated and the indistinct depiction of present counsel's role, I am hesitant to recommend too much tribute here for the insurance recovery.

On the other hand, the accession of one of America's largest corporations to an intrusive series of novel governance and monitoring initiatives was a commendable achievement for which credit clearly goes to counsel. Results like those here "can be socially efficient remedies for large-scale misconduct. Nonpecuniary settlements can offer benefits to defendants that can be shared with the plaintiff class, making all parties better off." *See* Geoffrey Miller & Lori Singer, *Nonpecuniary Class Action Settlements*, 60 J. Law & Contemporary Problems 97, 99 (1997); *see also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) ("[d]espite the difficulties they pose to measurement, nonpecuniary benefits to the corporation may support a settlement" and "[t]his is particularly true when the relief is intended to prevent future harm"). Though the value of these reforms cannot be reduced scientifically to dollars and cents, counsel are entitled to sizable compensation for this corporate *mea culpa* and measures that enhanced the company's goodwill, standing and profitability into the future.

**(9)  The experience, reputation, and ability of the attorneys**

Counsel in this action were all experienced members of the

35

plaintiffs' bar practicing in the area of corporate securities and derivative action law. Counsel have submitted detailed and impressive firm biographies. These include information about challenging cases in which counsel have achieved great success and earned the commendation of the judiciary. For example, John Emerson represented plaintiffs in derivative litigation against Computer Associates and in the Enron ERISA litigation. (Compendium, Ex. 12D.) Richard Greenfield was selected by the *National Law Journal* as one of the nation's 100 most influential lawyers. (*Id.,* Ex. 12E.) Morris & Morris was co-counsel in the Mutual Fund Multidistrict Litigation and the Christie's antitrust class action. (*Id.,* Ex. 12F.) The Barrack firm served as lead counsel in the WorldCom, Inc. and Cendant Corporation litigation, among others. (*Id.,* Ex. 12G.)

Of the remaining firms, some, such as the Abbey Spanier firm, are well known for high quality work in financial litigation and others, though much smaller firms perhaps having lower profiles, utilized their evident experience and skill to contribute to the successful result achieved here. The experience, reputation and ability of each of the firms in this case were superior and worthy of compensation at reasonably high rates.

**(10) The "undesirability" of the case.**

"Undesirability" should be measured in context. This case might be considered undesirable by a firm with a stable of clients who pay by the hour. It is also generally undesirable in

36

the sense of facing well funded, prominent individual defendants and the board and special committee of a mammoth corporation, all represented by some of the top defense lawyers in the nation.

On the other hand, for lawyers, like the applicants, whose practices consist heavily of class, derivative and securities actions against similar types of opponents, this action was relatively promising.   The risk was shared among ten firms. Counsel had the benefit of two large parallel cases and a federal criminal investigation.   The Company maintained a large directors and officers insurance policy.

The  criminal  proceedings  culminated  in  a  deferred prosecution agreement, inked long before the present settlement. AOLTW was cited by the SEC for limited violations in 2000 and entered into the deferred prosecution agreement with the United States Attorney for the Eastern District of Virginia on December 14, 2004.    Several peripheral figures were indicted, various Company executives implicated in the irregularities lost their jobs and the company restated its accounting during the pendency of the action.

The financial scandal also drew widespread media attention, conferring the reputational benefits envisioned in *Arbor Hill*. The fact that ten different firms jumped into the fray bespeaks an element of desirability.

**(11)  The nature and length of the professional relationship with the client.**

There is nothing in the extensive record prepared by counsel that elucidates this factor.   By the nature of this derivative

37

case, the plaintiffs were shareholders who sought, through counsel, to vindicate the rights of the corporation. Most of the clients were individuals, but the Barrack firm represented a pension fund. There is no indication whether there was a regular relationship between the fund and the law firm.

Regardless, this particular *Johnson* factor should have no material impact on the outcome. The fee is not being paid by the clients. Not surprisingly, the record contains no history of hourly payments from the clients on which the Court can rely for guidance. Neither attorney nor client expected a client-paid fee. Instead, as is customary, they anticipated payment from a recovery in the action.

**(12) Awards in similar cases.**

Counsel cite a matrix of sizable awards in other cases. Although *Arbor Hill* reminds us to avoid excessive homage to benchmarks, determinations in comparable cases remain a factor if, for no other reason, because the fees in these cases are invariably court-awarded and, therefore, the courts play a pivotal role in calibrating the market.

One difficulty here is a lack of precise comparables. Not only is it rare to assess fees in a corporate derivative action where the relief was non-monetary, but there is the added dimension of a fee negotiated between counsel and the corporation, with the assistance of the Special Master who helped settle the underlying case.

Fees and expenses of $9.2 million were awarded in the Shell

derivative litigation. *Unite Nat'l Retirement Fund v. Watts*, No. 04-Cv-3603, slip op. at 10-11 (D.N.J. Oct. 27, 2005). That case too ended in a settlement featuring a series of corporate governance reforms. Beyond that, it is not unusual to see multimillion dollar fee awards generated in monetary settlements of massive corporate infraction cases. *See Carlson v. Xerox Corp.*, 596 F. Supp.2d 400, 405, App. A (D. Conn. 2009)(collecting cases). The award sought here is considerably below those issued in the AOLTW securities and ERISA cases, where fees of $147,500,000 and $17,865,395 were granted, respectively.

This is also a case entailing a rare conflation of circumstances, including an absence of specific monetary recovery, the use of hourly rates in a non-statutory fee case and a mediated fee. While the few comparables suggest that the fee falls within comfortable bounds, this is an award built on lodestar, and therefore not mechanistically guided by results in similar cases.

### Fee Recommendation

The district courts, and even the Court of Appeals itself, are still grappling with the implementation of *Arbor Hill*. Some courts and commentators have viewed it as revolutionary, transforming district judges into surrogate clients with vast discretion to engage in virtual bargaining over the fee. *See* Note, *Questioning the "Presumptively Reasonable Fee" as a Substitute for the Lodestar Method*, 76 U. Cin. L. Rev. 1371, 1386, 1392 (2008). The majority of courts, however, seem to view *Arbor Hill* largely as a re-sequencing of the process, with a

heightened    emphasis    on    moderation    and    the    competitive marketplace.  *See, e.g., McDow v. Rosado*, 05-Cv-9787, slip op. at 4 (S.D.N.Y. Sept. 29, 2009) (Holwell, J.) ("[i]t is not obvious how this process substantively differs from the lodestar approach except perhaps to emphasize that relevant Johnson factors are to be considered when establishing the reasonable hourly rate"); *Steinberg v. Nationwide Mut. Ins. Co.*, 612 F. Supp.2d 219 (E.D.N.Y. 2009).

The *Arbor Hill* doctrine emanates from a statutory fee-shifting case.    Nevertheless, a number of district courts have not hesitated to invoke its principles in common fund and other fee-based situations, including a prior decision arising from the AOL Time Warner scandal.  *See In re AOL Time Warner, Inc. ERISA Litig.*,  No.  02-Cv-8853,  2007  WL  3145111  at  *1  (S.D.N.Y. 2007) (adopting Special Master's Report & Recommendation which considered *Arbor Hill*); *Steinberg v. Nationwide Mut. Ins. Co.*, 612 F. Supp.2d 219; *Finkel v. E. End Elec. Assocs., Ltd.*, 06 Cv. 2169(FB)(RLM), 2007 WL 2572167, at *4 (E.D.N.Y. Aug. 31, 2007) (adopting Magistrate Judge's calculation of attorney's fees and costs, 06 Cv. 2169 (FB), 2007 WL 2572169, at *6-*7 [E.D.N.Y. July 10, 2007]).  And, as *Arbor Hill's* holding is directed toward the calculation of a reasonable hourly based fee, there is little reason   to   eschew   its   guidance.     That   being   said,   the recommendation here is designed to pass muster under *Goldberger*, relying on *Arbor Hill* only for reinforcement.

The relative weight given to each of the *Goldberger* or

*Johnson* factors depends on the overall circumstances of the case at hand:

> In reviewing an attorneys' fees award in a class action settlement, a district court should consider all factors that are useful and relevant with respect to the particular facts of the case. The factors should not be applied formulaically; in cases involving extremely large settlement awards, district courts may give some factors less weight than others in evaluating a fee award. It is important in all cases that the district court robustly engages in assessments of the fee award reasonableness factors with close scrutiny of fee arrangements in class action settlements.

*Current Decisions Survey*, 27 Class Action Rep. 34 (2006).

The *Johnson* findings here can be distilled into several broad conclusions that should drive the award. First, the case fell close to the midpoint of overall risk. Risk is a multifaceted concept. There is risk of protracted proceedings, risk of loss at various stages and financial risk assumed by the attorneys. The risk of protracted litigation existed here, but was tempered by the settlements of the other cases and the early intervention of mediation. These same factors suggest that an outright loss was unlikely here, both because most cases of this type end in settlement, Janet Cooper Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. Rev. 497, 597 (1991), and because the prior settlements and successes of the Special Master in the companion cases augured a meaningful outcome here. Counsel correctly argue that a derivative action requires an additional measure of proof against the company's officers and directors, but that hurdle is eased by the basic

41

foundation built on the other litigation, media and governmental investigations and the resourcefulness of Special Master Wachter.

Counsel assumed a sizable financial risk by filing these cases. They devoted many professional hours to the prosecution and mediation, without progress payments. In many instances, the firms advanced funds for contract attorneys and disbursements. At the same time, the defendants consisted overwhelmingly of highly successful individuals, backed by insurance coverage, against whom a judgment stood a good chance of collection. It is true that there were competing claims against the insurance policies at the commencement of the case. But there also exists abundant evidence that cases of this magnitude frequently end in settlement because *neither* side wants to assume the ultimate risk of a jury verdict or summary judgment. *See* Alexander, 43 Stanford L. Rev. at 578 ("evidence seems to show that derivative actions tend to be resolved . . . with no tangible economic benefit to the corporation, plus large attorney's fees"). This risk is an issue not only for the immediate defendants, but globally for director and officer insurers, for whom a losing precedent could have broad impact.

The issue of risk is an important one, as it is built into the hourly rate structure and any multiplier. Taking the situation as a whole, this case entailed risk but not of an unusual magnitude.

Second, the case required and received high quality legal work. By the same token, such work is expected of the fine firms

involved and the premise of excellence is built into the firms' hourly rates.

This segues into the third fundamental conclusion, namely that the hourly rates utilized by counsel here fall on the "higher end of the prevailing range." *See Goldberger*, 209 F.3d at 56. This finding takes on added impact in the wake of *Arbor Hill*. A sophisticated but thrifty client would not unquestioningly accept an hourly rate dictated by the law firm, especially where other firms were competing for the work and some of the firms are based in lower cost areas outside of New York. Aside from the need for local counsel in New York, all of the firms accurately claim to be comparable in experience and skill.

Any argument that counsel's rates should be considered in the context of a "national bar" is partially undermined by the rates proffered by the various firms. Examining the senior partners, for example, Arthur Abbey in New York was billed at $850 per hour, Richard Greenfield in Philadelphia was billed at $695, Karen Morris in Delaware was billed at $585 and John Emerson in Arkansas was billed at $585. A review of their work reveals generally comparable high quality, leading to a finding that the fee differential is attributable largely to location-driven overhead or arbitrary profit expectations of counsel.

Notwithstanding these differentials, the hourly rates designated by counsel are well above the average rates in the firms' respective locales and press the envelope of the presumptively reasonable fee envisioned in *Arbor Hill*. But this

too does not end the inquiry in this case.

Counsel's voluminous time records were submitted on the basis of their historical hourly rates on the later dates on which the work was performed. At our conference, I pointed out to counsel that I was prepared to award a current presumptive fee, as authorized by *Missouri v. Jenkins*, 491 U.S. 274 (1989), to compensate for the inevitable delay in payment. Counsel declined my invitation, no doubt because recalculating these capacious submissions would have posed a heavy burden and led to further delay.

Billing rates across the country have increased since settlement was reached in 2006. Based on my own observations,[18] annual hourly fee increases of $25 to $50 at the top levels have been common throughout the past decade. Authoritative sources bear this out. The *National Law Journal* has reported annual average increases as high as 7.7 percent during the period. *See* Leigh Jones, Law *Firm Fees Defy Gravity*, *Annual Survey Shows*, Natl. L. J., Dec. 8, 2008. At the end of last year, at least one lawyer's billing rate had soared to $1,260 per hour, while at least four other firms broke the $1,000 barrier. *Id.* Various firms in New York, Chicago, Palo Alto and Washington, D.C. were billing some partners at over $900 per hour. Average hourly rates

---

[18] The Court of Appeals has specifically approved the practice of judges and special masters who draw upon their own knowledge when evaluating billing rates. *See*, e.g., *Assoc. for Retarded Citizens of Conn., Inc. v. Thorne*, 68 F.3d 547, 554 (2d Cir. 1995) ("a [court] may 'rely in part on [its] own knowledge of private firm hourly rates in the community'"); *see also Goldberger*, 209 F.3d at 56.

among the firms surveyed nationally were $451 for partners and $282 for associates. *Id.*

Counsel here use high end rates. By the same token, the complexity of this case demanded exceptionally able counsel, who, in turn, faced top defense attorneys, in terms of credentials and hourly rates.

The increase in customary billing rates since 2006 offsets to a large degree the cuts I would have recommended in the billing rates requested by counsel, in order to reach a presumptively reasonable fee under the historic numbers submitted.[19] Because the formulation of a presumptively reasonable fee is inherently an imprecise exercise, mathematical exactitude is not required. The uncertain interplay between *Simmons'* endorsement of host district rates, and *Arbor Hill's* eye toward thrift, gives further pause to an adjustment in the billing rates. Under these circumstances, I recommend that the historical rates proffered by counsel serve as the presumptively reasonable fee.

These rates, however, should be applied to the adjusted hours, rather than the gross hours claimed by counsel. A major criticism of the lodestar is its propensity to encourage hours over efficiency. *See* Report of the 3d Circuit Task Force, 108 F.R.D. at 248. Counsel should not be paid for tasks that were unnecessary, excessive, performed by inappropriately senior

---

[19] The Stipulation of Settlement entitles counsel to interest through the date of payment. (Stip. Of Settlement, May 2, 2006, ¶15.) But because that Stipulation requires the funds to be held in relatively conservative investment vehicles (*id.*, Ex. E at 1-2), the interest would not match the increase yielded by the

personnel or inadequately documented.  A reasonable, fee-minded client receiving monthly bills would question and resist such charges.  Again, this recommendation does not stem from any finding of purposeful overbilling by counsel, but, instead, derives from inefficiencies and recordkeeping deficiencies often found in cases of this extreme magnitude.

### Multiplier

The presumptively reasonable fee remains subject to an adjustment, upward or downward.  In this case, with its salutary outcome and counsel's large investment of time, effort and even funding, any adjustment should be positive. *→ no adjustment*

Historically, the two major factors driving a fee multiplier have been quality and risk.  *See Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ("'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained,'" *quoting Hensley*, 461 U.S. at 436); *see also Goldberger*, 209 F.3d at 54 (Second Circuit has "historically labeled the risk of success as 'perhaps the foremost' factor to be considered in determining whether to award an enhancement") (*citing Agent Orange,* 818 F.2d at 236).  Although multipliers were originally designed for exceptional risks or results, they have become widespread in these outsized derivative suits and class actions.

The admonitions toward moderation expressed in *Goldberger* and *Arbor Hill* warrant comment about the routine application of a

---

application of current hourly billing rates.

46

multiplier. In *Blum v. Stenson*, 465 U.S. 886 (1984), the Supreme Court discouraged the use of multipliers, at least in recognition of excellence or complexity of the work. The opinion held that "[t]he novelty and complexity of the issues presumably were fully reflected in the number of billable hours," *id.*, and "[t]he 'quality of representation' . . . generally is reflected in the reasonable hourly rate." 465 U.S. at 899. The Court further stated that "acknowledgement of the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee." *Id.* at 900. The Court did not address the use of multipliers to compensate for exceptional risk.

The Supreme Court tackled the risk question in *City of Burlington v. Dague*, 505 U.S. 557, a statutory fee-shifting case. The Court observed that "[t]he risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits," *id.* at 562, and that "no claim has a 100% chance of success." *Id.* at 563. The Court concluded, with respect to the fee-shifting statutes, that "[c]ontingency enhancement is therefore not consistent with our general rejection of the contingent fee model for fee awards, nor is it necessary to the determination of a reasonable fee." *Id.* at 557.

Still, the multiplier refused to die. Nevertheless, some courts reaffirmed the exceptional nature of the enhancement.[20] In

---

[20] At least one opinion has construed *Dague's* comment that "no

47

*Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527 (8th Cir. 1999), for example, the Eighth Circuit held:

> An upward adjustment to an attorney's lodestar hourly rate is permissible in certain rare and exceptional cases, supported by both specific evidence on the record and detailed findings by the lower courts. Because the lodestar amount may already compensate the applicant for exceptionally good service and results, however, the fee applicant must do more than establish outstanding service and results. The applicant also must establish that the quality of service rendered and the results obtained were superior to what one reasonably should expect in light of the hourly rates charged and the number of hours expended.

The Supreme Court also has not said whether its disapproval of enhancements in *Hensley*, *Dague* and other statutory fee-shifting cases applies with equal force to derivative actions and other common fund cases. Without decisively addressing this question, *Goldberger* makes a clear assumption that multipliers for risk and quality survive in the Second Circuit, though reserved for select cases. Contrast *In re Bolar Pharmaceutical Co., Inc. Sec. Litig.*, 800 F. Supp. 1091, 1095 (E.D.N.Y. 1992)(holding that the rationale for disallowing multipliers in statutory cases should apply with equal force to common fund or common benefit situations).

Regardless of any categorical difference between statutory

---

contingency enhancement whatever is compatible with the fee-shifting statutes at issue," *id.*, to mean that an enhancement for risk is virtually never permitted. *See Purdue v. Kenny A.*, 532 F.3d 1209 (11th Cir. 2008), *cert. granted*, ___ U.S. ___ (2009). Commentators anticipate that the Supreme Court will use *Perdue* to resolve finally the issue whether multipliers are ever permitted, at least in statutory fee cases. *See* Tony Mauro, *Justices Doubt Lawyers Should Be Paid Extra for Winning*, N.Y.L.J., Oct. 16, 2009 at 1.

and other types of cases, it is unquestionably true that risk, quality and experience are ingredients in the formulation of an hourly billing rate. *See* Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* §14:6 (Thomson-West, 4th ed. 2002)("market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case").

In *Goldberger*, the Second Circuit signaled its displeasure with the routine use of multipliers. In fact, in that case, the Court of Appeals affirmed the district court's denial of *any* multiplier, on the basis that the high hourly rates of counsel already accounted for risk and quality. Despite this call for moderation, and the "nagging suspicion that attorneys in these cases are routinely overcompensated for such things as contingency risk," *id.* at 57, enhancements continue to flourish within the Second Circuit in common fund cases.

Counsel's original fee request of \$9.6 million was based on a multiplier of 1.60.[21] This is a relatively low multiplier, measured by the range more recently awarded by various judges in this district and others. *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (multipliers between 3 and 4.5 are common); *see also Wal-Mart*, 396 F.2d at 123 (3.5 multiplier); *WorldCom*, 388 F. Supp.2d at 354

---

[21] Here, too, there was a minor mathematical error in counsel's submissions. Counsel acknowledge that 1.60 is the correct number.

(4.0 multiplier); *In re Avon Products, Inc. Securities Litig.*, Fed. Sec. L. Rep. (CCH) ¶97061, 1992 WL 349768 (S.D.N.Y. 1992) (decision used percentage method, but stated that under the lodestar approach a risk multiplier of 2 to 3 would have been appropriate); Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* §14:6 ("[m]ultiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied"); Wayne Schneider, *Courts Don't Have to Award Excessive Fees*, 20 NAPPA Report at 10 (range of multipliers between 1.37 and 3.1 in seven representative class action settlements in 2004 and 2005); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001), *cert. denied sub nom. Kirby McInerney & Squire, LLP v. Joanne A. Aboff Family Trust*, 534 U.S. 889 (2001) (in surveying cases with common funds over $100 million, court found multiplier of 1.35 to 2.99 common); *compare* William J. Lynk, *The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class-Action Litigation*, 23 J. Legal Studies 185, 196 (1994)(reporting an average multiplier of 1.69 for class actions studied between 1973 and 1990).

It is important to note, however, that the district courts in the Second Circuit, since *Goldberger*, have applied the percentage-of-recovery approach in common fund cases and utilized the lodestar method only as a cross-check. There appears to be no published opinion since *Goldberger* in this circuit that utilized the lodestar method from the ground up in anything other than a statutory fee case.

The present case resembles *Goldberger* to some degree, as it involves many of the standard risks attendant to derivative and securities actions, as well as prominent plaintiffs' law firms with high billing rates. As with Drexel Brunham Lambert (the firm at the heart of *Goldberger*), the financial transgressions were exposed by the national media before the lawsuit was filed and were the subject of government investigations and eventual indictments. Ten separate law firms shared the workload and, accordingly, the risk. By the time that this action gathered steam and entered the mediation that produced the settlement, the securities action had settled for $2.5 billion and the ERISA action stood on the verge of one of the largest settlements of its type.[22] *Compare In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02-Cv-8853 (S.D.N.Y. Aug. 7, 2007) (assessing case in phases) *with Goldberger*, 209 F.3d at 55 (holding that risk should be measured as of inception). Many aspects of this case were not high risk.

On the other hand, this case required penetration of the corporate boardroom to establish liability and ended with the somewhat unusual result of extensive future corporate reforms without a recovery of money damages. In this respect, counsel took one unusual risk. Without having their fees assured, counsel yielded the claims for money damages, which would have generated a common fund. That, in turn, would have strengthened

---

[22] The securities case received preliminary settlement approval in September 2005 and the ERISA case was settled by Special Master Wachter in February 2006.

their prospect of a sizable attorneys' fee.   Instead, counsel negotiated a nascent form of corporate managerial relief,[23] designed to benefit the company and its shareholders in the future and deter a recurrence of this expensive and embarrassing litigation.[24]   It is for this risk, and the ingenuity applied in crafting this settlement, that a multiplier is recommended.   *Cf.* *In re Diet Drugs Prods. Liab. Litig.*, ___ F.3d ___ (3d Cir. 2009) (holding that, although the Third Circuit had "never addressed whether courts *must* reconsider the risk of nonpayment as the action evolves" [emphasis added], it was nevertheless permissible for the district court to have done so).   It will also serve as an incentive for future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis.   *Id.* at n. 41 (citing innovative settlement in assessing fees).

---

[23] At the time of this settlement, there was only one other corporate reform settlement comparable in structure and magnitude and lacking in discrete financial compensation, *UNITE Nat'l Retirement Fund v. Watts* (No. 04-Cv-03603 [D.N.J.])(appended at Tab 10, Vol. 1 of counsel's Compendium of Exhibits).   Counsel had no reliable means of placing a dollar value on these reforms or significant reservoir of precedent to support their application for a fee under these circumstances.

[24] Viewed simplistically, this conclusion might run afoul of the notion that litigation risk should be measured as of when the case is filed.   *See Goldberger*, 209 F.3d at 55; *DiFilippo v. Morizio*, 759 F.2d 231, 234 (2d Cir. 1985).   But the risk that counsel would have to settle for non-monetary damages always existed in this case.   It merely came into focus later in the proceedings, leaving counsel with a choice of pursuing a potentially elusive monetary goal or the immediate adoption of salutary corporate reforms which the courts probably would not be empowered to decree.   By electing the latter course, counsel elevated the interests of their clients far above their own and made their recovery of fees, and the expenses they advanced, a more complicated and uncertain process.

The requested multiplier of 1.60 is at the lower end of the range recently seen, which has generally run between 1.5 and 4.0. *See also In re Cendant Corp. PRIDES Litig.*, 243 F.3d at 735-36 (3d Cir. 2001)("strongly suggest[ing]" a multiplier of 3 as the ceiling for an award in a simple case where "no risks pertaining to liability or collection were pertinent"). As applied to the presumptively reasonable fee, but not the expense component, this yields a total award of $8,772,335.60.

Beyond the pioneering aspects of this case, two other factors convince me that this amount is reasonable. First, counsel have taken the unusual step of absorbing their out-of-pocket expenses within their fee request. Ordinarily, such expenses are compensable, both in the marketplace and in derivative actions. Counsel reported $389,023.28 in such expenses. Although, in the absence of such a concession, I would have trimmed the expenses in a few areas, the vast majority of the outlays were reimbursable. While this is not a basis *per se* for a multiplier (other than perhaps the financial risk of these advances that existed during the case), it supports the numerical end product of the multiplier. In line with counsel's original methodology, the multiplier is not applied to $389,023.28 of the award.

Additionally, the requested fee here, and the multiplier that generated it, were the products of a mediation under the auspices of the same special master who settled the underlying case, as well as the two companion cases. While this factor is

by no means decisive, it provides an additional measure of support for the request.

Negotiated fees have been cited with favor by some courts. In *Nortel*, the Second Circuit, though declining to determine "precisely how much weight to accord a negotiated fee," nevertheless stated its expectation that this factor would be given "serious consideration":

> We leave open the question of how much weight should be given to fees agreed upon by PSLRA lead plaintiffs. We expect, however, that district courts will give serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate, thus providing a good starting position for a district court's fee analysis.

539 F.3d at 133-34. While *Nortel* involved a fee negotiated between a lead plaintiff and counsel in a securities action, the corporation was in an analogous position here because, in a derivative action, it has a "significant financial stake" in the outcome. And in the present case, the mediations of the underlying action and the fees were conducted sequentially, further minimizing the possibility of actual or tacit collusion. *Cf. D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)( "a court-appointed mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure," citing *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323 [2d Cir. 1990]); *see*

*also* Stipulation of Settlement, ¶17 ("an award of attorneys' fees and expenses that is less than the amount requested by Plaintiffs shall not be grounds for termination or cancellation of the Settlement").

At the same time, there always exists some possibility for collusion, not necessarily in a nefarious sense, but at least in a natural convergence of the desire of the corporation's leaders to extinguish the claims and the aspiration of counsel for generous fees. Accordingly, the mediated fee is undeserving of a presumption, but lends further credence to the overall result.

### Objections

The principal objection emanates from Badzik, the purported shareholder represented by counsel. The objection is several fold.

First, he questions the weight to be given the $200 million insurance recovery in assessing counsel's achievements. This Report & Recommendation agrees to a considerable extent, declining to treat that number as it would a monetary recovery obtained by counsel in this case.

Second, Badzik urges that "the time sheets in this matter be carefully scrutinized to avoid . . . excess billing." This has also been done. In fact, the recommended fees are based on hourly billing rates, with substantial reductions in the requested time charges.

Third, he questions the materiality of the changes in corporate governance extracted through this litigation. Judge

55

Kram, however, found those results to be substantial and praiseworthy in approving the underlying settlement. *See* Slip op. at 9 ("[t]he preventative aspect of these provisions is itself a significant benefit of the Settlement").

The remaining point of contention is the use of the multiplier to enhance the fees of so-called "contract" or "temporary" attorneys who engaged chiefly in document coding.[25] The contract attorney time amounted to 11.4 percent of the lodestar. (Letter of Karen L. Morris, Sept. 16, 2009 at 2.) The objector argues that the service was more clerical than legal, and that the firms seek a huge markup on the differential between their payment to the businesses referring the contract attorneys and the hourly rates sought.

Badzik supports his objection with submissions made by former contract attorneys in another case, *Carlson v. Xerox Corp.*, D. Conn., No. 00-Cv-1621 (AWT), in which they alleged that class counsel there (not those engaged here) were profiteering on the spread between the cost of the contractors and their billing rates. In *Carlson*, contract lawyer time constituted 63 percent of the total lodestar. Badzik presumably offered these materials simply as background to acquaint the Court with an alleged practice, as surely the Court cannot be expected to extrapolate

[25] "A temporary lawyer usually is hired by other lawyers, law firms and corporate legal departments . . . to work on a single matter or a number of different matters, depending upon the firm's staffing needs and whether the temporary lawyer has special expertise not otherwise available to the firm." George C. Rockas, *Lawyers For Hire and Associations of Lawyers: Arrangements that Are Changing the Way Law is Practiced*, 40

the conduct of counsel in one action into another action entailing different counsel and different circumstances.

The short answer to this objection is that the district court in *Xerox* rejected the argument. *Carlson*, 596 F. Supp.2d at 409-10; *see also Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 586 F. Supp.2d 732, 783-84 (S.D. Tex. 2008); *In re Tyco Intern., Ltd. Multidistrict Litig.*, 535 F. Supp.2d 249, 271-74 (D.N.H. 2007).

The objector's contention is, in any event, not persuasive. Counsel report that the contract attorneys here were not mere clerks, but exercised judgments typically reserved for lawyers, under the supervision of the firms' regular attorneys. The review of any given document can potentially involve bare reading of some portions and judgmental review of other portions. Efforts to parse these functions in a case of this dimension would be unproductive.

Badzik goes on to suggest that the hourly fees attributed to contract attorneys, even if accepted as part of the basic lodestar, should be excluded from the selected multiplier. With one important exception, this objection too is overruled.

First of all, the drivers of any multiplier are quality and risk. It is with respect to risk, in particular, that the objection loses its allure. Counsel not only paid for the services of the contract lawyers, but also dedicated the time of their regular personnel to supervision. Because the risk is ultimately financial, counsel's recoupment risk in employing

---

Boston Bar J. 8 (1996).

contract attorneys is no less uncertain than that relating to the salaries paid to their regular employees.

The charge of a mark-up on the contract attorney payments does not change the result. Law firms are not eleemosynary institutions. Economic rationality dictates that the fees they charge clients be higher than the amounts paid to their timekeeping personnel. The Court should no more attempt to determine a correct spread between the contract attorney's cost and his or her hourly rate than it should pass judgment on the differential between a regular associate's hourly rate and his or her salary. *See also* ABA Comm. on Ethics & Prof'l Resp. Formal Op. 00-420 (Nov. 29, 2000)(opining that a firm may charge a markup to cover overhead and profit if the contract attorney charges are billed as fees for legal services). The ultimate test in *Goldberger's* and *Arbor Hill's* marketplace is what a reasonable client would pay for the individual's time.

Contracted personnel are now a feature in the legal community. *See* Rockas, 40 Boston Bar J. at 8. Reimbursement for these personnel is consistent with the Second Circuit's endorsement of market-driven compensation.

Beyond Badzik, only ten other shareholders objected to the attorney's fees in the settlement. All of those objections were conclusory, essentially stating that the fees sought were "too much." This Report & Recommendation agrees, to the extent of reducing the fee request by $827,664.40. Otherwise, the paucity of objections to the fee proposal is another factor commending

approval of the remaining balance.    *See Wal-Mart*, 396 F.2d at 118-19.

## Conclusion

This Report & Recommendation draws from the best aspects of various methodologies in an effort to compute a fee that is fair to shareholders, is commensurate with the practices of a thrifty, bill-examining client and provides sufficient rewards and incentives so that these counsel, and others who follow, will enlist in future causes for the public good and innovate where appropriate without fear that their efforts will go uncompensated.    The recommended fee of $8,772,335.60 eliminates the types of excesses that have spurred criticism of the lodestar, reflects the compensation structure of the marketplace, embraces the multiplier agreed in mediation and closely tracks the fee approved in the nearest comparable case.

Dated:   New York, New York
         November 9, 2009

Respectfully submitted,

DAVID H. PIKUS
Special Master